**SO ORDERED.**

**SIGNED this 27th day of December, 2012.**



_____
Robert E. Nugent
United States Chief Bankruptcy Judge

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

IN RE:

PATRICK NORMAN BARKER,   )   Case No. 10-12926
                         )   Chapter 11
            Debtor.       )
_____)

**ORDER GRANTING IN PART VIANELLO FORENSIC CONSULTING L.L.C.'S
MOTION FOR ADMINISTRATIVE EXPENSES**

Like the rest of us, creditors tend to act in their own perceived best interest. Perhaps that explains why the Bankruptcy Code only allows creditors compensation by the estate for their work in a case in narrowly-defined circumstances. But when a creditor's recovery efforts benefit the estate or the creditors as a body, 11 U.S.C. §§ 503(B)(3)(D) and (b)(4) permit the creditor to be awarded its reasonable attorneys fees and expenses. As long as the creditor's actions make a substantial contribution to the case by benefitting the estate and are not solely self-interested, those expenses

-1-

that are directly related to the creditor's actions may be treated as an administrative expense.

In this case, Vianello Forensic Consulting L.L.C. (VFC) seeks attorneys fees and expenses in the amount of $51,976.19 for its work in the case, and specifically for its efforts to successfully shape the sale of a principal estate asset and to lead the opposition to the debtor's initial plan.[1] The debtor opposes the motion on two grounds, asserting first that VFC's application is untimely, and further, that VFC did not make a substantial contribution to the case. Even if the application was not timely filed, the court may allow it to be filed late for cause. And, as VFC was instrumental in taking actions that resulted in a substantial dividend to the unsecured creditors, it made a substantial contribution for which it should be awarded reasonable attorneys' fees and expenses, albeit limited as set out below.

**Jurisdiction**

The allowance of an administrative expense application under § 503 is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O), over which this Court may exercise subject matter jurisdiction under 28 U.S.C. § 1334 and § 157(b)(1).[2]

**Facts**

In 2008, Dr. Barker and Orion Ethanol, Inc., an entity in which he owned an interest, retained VFC to act as an expert witness in litigation then pending in the U.S. District Court for this District. Orion is now bankrupt, leaving Barker liable under the parties' engagement agreement for VFC's

---

[1] Dkt. 380, Motion for Administrative Expenses. This amount is comprised of attorney fees of $48,423.17, expenses of $1,053.02, and one-half of an appraisal fee for an independent appraisal of the debtor's tracts of land in the amount of $2,500.

[2] An evidentiary hearing on VFC's motion was held October 16, 2012. VFC appeared by its attorney Thomas J. Lasater. The debtor appeared by his attorney J. Mark Meinhardt. Attorney Joyce Owen also appeared on behalf of the United States Trustee.

-2-

fees and expenses.[3] VFC holds an unsecured claim for fees and expenses that amounts to $388,409.[4] The unsecured creditors claim pool totals approximately $2.68 million. While it was not the largest unsecured creditor, VFC was, by far, the most active creditor in this bankruptcy case. In the course of those efforts, it incurred attorneys fees and expenses billed by and paid to the Fleeson Gooing law firm of $51,976.

Marc Vianello owns VFC. He is a certified public accountant who specializes in forensic accounting and business valuation, often in support of litigation. Since Barker owed VFC over $388,000, Vianello was highly motivated to take an active and leading role in the case, particularly as no official unsecured creditors committee could be organized. Moreover, Vianello's skill set especially suited him and VFC to investigate and analyze Barker's chapter 11 case. While several other creditors were active in the case, VFC was the only active unsecured creditor and often took the laboring oar.

This case was filed on August 26, 2010. The Fleeson Gooing law firm entered its appearance for VFC in October, 2010. As the firm's billings reflect, Fleeson Gooing and its client immediately began monitoring the proceedings and investigating the facts. VFC frequently took positions directed at maximizing the assets of the estate and the recovery of the unsecured creditors. this work focused on two particular areas: selling the debtor's ranch and negotiating the terms of the debtor's chapter 11 plan. VFC's efforts greatly benefitted not only itself, but other creditors as well.

Dr. Barker is a general surgeon and a resident of the Pratt, Kansas area. When he filed this case, he and his wife (who was not a debtor) owned and lived on a 3,360-acre ranch in rural Pratt

---

[3] *See* Claim no. 5-1, p.3.

[4] See Claim no. 5, filed October 11, 2010.

County. In Barker's initial chapter 11 plan, dated January 21, 2011, he proposed to sell 2,160 acres of the ranch hoping to releasing sufficient equity beyond what he owed the mortgage-holders to allow him to settle is other debts, retain his exempt homestead quarter section, and keep another 1,000 acres.[5] His second amended plan, dated June 14, 2011, provided that the sale would be at absolute public auction or via "conventional marketing" and include all of the ranch except the 160 acre homestead.[6] But then, in August of 2011, Barker moved to retain a realtor (his cousin and neighbor) and to sell the property by private treaty to the current farm tenants.[7] VFC hotly opposed these motions.[8]

Under the proposed private treaty, the Barkers and their living trusts agreed to convey 3,200 acres of farm real estate (all but their homestead quarter section) for $2,400,000. The four buyers were the farmers already leasing the ranch. Their offer was a stalking horse, but one with unusual protection. Barker sought the approval of bid procedures requiring competing bids to exceed the contract price by $100,000 plus an undisclosed breakup fee. Subsequent bids were to be in incremental increases of not less than $50,000. In addition, the property would be auctioned as a whole unit, not by tracts. VFC and others objected.[9] At the contested hearing on the sale and bid procedure motion, VFC presented convincing evidence that significantly higher prices could be

---

[5] Dkt. 123, p. 4. This same treatment was proposed in Barker's first amended plan dated March 23, 2011, Dkt. 157. Confirmation of this plan was denied due to there being no impaired accepting classes.

[6] Dkt. 197, p. 4.

[7] Dkt. 211, 239 and 241.

[8] Dkt. 220, 264, 279, 282-285.

[9] In addition to VFC (Dkt. 264), judgment lien creditor Lubbock National Bank (Dkt. 260) and the United States Trustee (Dkt. 259) objected.

-4-

obtained by auctioning the property in tracts rather than as a whole. Based on that evidence, I denied the sale motion. When VFC then moved for an order compelling the debtor to sell, I denied that motion as well, concluding that the debtor in possession should be given an opportunity to sell the ranch in accordance with his second amended plan.

The order confirming the second amended plan was entered on February 2, 2012, resolving various objections, including VFC's.[10] As part of the negotiations, the debtor agreed that he and his wife would auction the ranch in separate parcels as VFC had advocated, and that he would retain as an auctioneer the J.P. Weigand and Company, the Realtors who had testified for VFC in the sale motion hearing. When the sale was finally conducted, the land brought well in excess of the private treaty buyers' anticipated $2,400,000 bid, yielding $3,343,762. The additional $943,762 funded a sizeable dividend for the unsecured creditors.

VFC remained active throughout the case. It initially attempted to acquire all of the other claims in the case in what Vianello admitted was an effort to control the reorganization case. But when that effort was unsuccessful, VFC focused on other typical creditor measures. In addition to opposing the sale, VFC participated in extensive fact investigation and discovery and negotiated the order confirming the plan along with subsequent orders dealing with how the remaining estate funds would be divided among the creditors and Mrs. Barker. A review of the docket in this case reveals VFC's participation at every turn. VFC was the only completely unsecured creditor to be so engaged and it garnered the support of several undersecured secured creditors in its efforts to maximize the benefits of the estate for the unsecured creditors pool.

After the debtor distributed sale proceeds to the various secured creditors holding mortgages

---

[10] Dkt. 341.

-5-

Case 10-12926    Doc# 432    Filed 12/27/12    Page 5 of 17

or other liens on the ranch, and after the payment of administrative expenses other than those sought by VFC, there remained a surplus of $332,581 for payment to the unsecured creditors, and the IRS.[11] Had the sale that Barker originally planned gone forward, none of this money would have been available. Mortgagees American Ag Credit and First Merit Bank were paid in full. Lubbock National Bank received a substantial amount in payment of its judgment liens. Mrs. Barker received payment for her undivided one-half equity interest. The IRS received $160,000 to cover estimated capital gain taxes on the sale. The unsecured creditors' pool will receive a lump sum payment of nearly $447,000 because Barker agreed to pay the proposed five years' disposable income payments of $200,000 in one discounted amount. The creditors fared better because of VFC's involvement in the case.

Concerning Barker's objection to the timeliness of VFC's request, Barker's second amended plan was confirmed in a order entered on February 2, 2012.[12] The plan provided that administrative expense requests were to be filed not later than 30 days after the entry of the confirmation order. VFC did not file its request for allowance until June 27, 2012, after the ranch sale had closed.[13]

**Analysis**

*Timeliness of VFC's Application*

At trial, Barker asserted for the first time that VFC's claim was time-barred because VFC filed it after the administrative bar date established by the confirmed plan, thirty days after the entry

---

[11] Dkt. 419. Class 10 of unsecured creditors received $260,581 of this surplus.

[12] Dkt. 341.

[13] The sale closed on May 10, 2012. *See* Dkt. 355, Motion for Authority to Disburse Sale Proceeds filed April 30, 2012 and Partial Orders granting disbursement entered May 3, 2012 (Dkt. 362), May 15, 2012 (Dkt. 366), May 29, 2012 (Dkt. 374), July 23, 2012 (Dkt. 392) and final Order on disbursement motion entered October 25, 2012 (Dkt. 419), reserving sale proceeds pending a final determination of VFC's administrative claim.

of the confirmation order. That order was filed on February 2, 2012, the thirtieth day thereafter was March 3, 2012, and VFC's motion was not filed until June 27, 2012.

Section 503(a) permits an entity to "timely file" a request for payment of an administrative expense. It also permits an entity to "tardily file" such a request, if permitted by the court "for cause." There is no other reference in the Code to any process or procedure for filing administrative allowance applications. *Collier's* bankruptcy treatise notes that the legislative history indicated that these procedures were to be left to the Bankruptcy Rules.[14] But there is no reference to this process in the Rules either. Instead, courts have the power to set and enforce administrative allowance deadlines and frequently do.[15] Similarly, there is no definition in the Code or Rules of "cause" in this context. *Collier's* suggests that the standards of Rules 3002(c)(1), 3003(c)(3) and 9006(b)(1) be applied to applications for late filing, suggesting that "excusable neglect" may be the applicable standard for relief.[16]

At first blush, Barker's belated objection appears valid because the bulk of VFC's activities in opposition to the original sale occurred nearly a year before confirmation. But the estate received no benefit from these efforts until well after the administrative bar date ran. Indeed, immediately before the confirmation date, the parties were still negotiating about plan terms including the sale of all but the debtor's homestead. The auction itself did not take place until more than thirty days after the plan was confirmed and well after the expiration of the bar date. Until the sale took place, no one could really know whether the unsecured creditors would benefit from VFC's efforts. Only

---

[14] 4 COLLIER ON BANKRUPTCY, 16th Ed., ¶ 503.02.

[15] *See Hall Financial Group, Inc. v. DP Partners L.P. (In re DP Partners L.P.)*, 106 F.3d 667 (5th Cir. 1997).

[16] 4 COLLIER ON BANKRUPTCY, 16th Ed., ¶ 503.02[2].

after it became apparent that they would benefit did VFC file its motion.

Thus, if VFC's motion is "tardy," we should apply the excusable neglect standard to determine whether it should be relieved from the bar date for cause. The late filing did not prejudice the debtor or delay judicial proceedings. As noted, VFC could not file the motion until it determined there was a meritorious basis for filing it and that could not have occurred until after the sale. The sale's timing was not within VFC's reasonable control and there is nothing here to suggest that VFC acted in other than good faith.[17] So, to the extent the motion was filed out of time, the Court allows its late filing for cause.

### *Section 503(b)(3)(D) and (b)(4): Substantial Contribution in a Case and Attorneys's Fees*

Section 503(b)(3)(D) grants administrative allowance status for "actual, necessary expenses" that a creditor incurs "in making a substantial contribution in a case under chapter 9 or 11 . . . ."[18] Section 503(b)(4) allows the recovery of reasonable compensation for an attorney who assists the creditor in making the substantial contribution. The reasonableness of the compensation is based upon the time, nature and extent of the attorneys' work, the cost of comparable services, and reimbursement for actual expenses incurred. Thus the questions here are whether VFC made a substantial contribution to the case and, if so, whether the fees and expenses it paid Fleeson Gooing were reasonable and necessary.

In determining whether a creditor's work constitutes a "substantial contribution," courts in the Tenth Circuit consider three elements with respect to a creditor's prepetition and postpetition

---

[17] *See Pioneer Inv. Services Co. v Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed. 2d 74 (1993).

[18] 11 U.S.C. § 503(b)(3)(D).

-8-

efforts: (1) whether the efforts were undertaken with the intent to benefit the bankruptcy estate; (2) whether the efforts directly benefitted the estate or whether the benefit to the estate was only incidental; and (3) whether the applicant has rebutted the presumption that it acted primarily for its own benefit rather than the estate as a whole.[19] These factors are more easily stated than applied because of their tendency to overlap and because determining whether the contribution was "substantial" is fact-driven inquiry. As another bankruptcy judge in this District has noted, the first standard emphasizes intent and bars reimbursement where the creditor's actions "were designed primarily to serve its own interests" and would have been taken anyway.[20] At the same time, most courts do not require that the applicant's actions be solely motivated by altruism.[21] As the third standard suggests, applicants are presumed to have acted primarily in their own interests as opposed to the estate as a whole. In assessing a creditor's post-petition efforts under the substantial contribution standard, the *Lister* court stated that "post-petition efforts must result in an actual and demonstrable benefit to the bankruptcy estate" to be compensable.[22] As the applicant, VFC has the

---

[19] *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988) (analyzing both a creditor's prepetition and post-petition activities). See also *In re Brooke Corp.*, 443 B.R. 856, 868 (Bankr. D. Kan. 2011) and 4 COLLIER ON BANKRUPTCY, 16TH Ed., ¶ 503.10[5][a] (citing five factors courts have considered but noting that the principal factor for whether a substantial contribution has been made is the extent of benefit to the estate).

[20] *Brooke,* 443 B.R. at 868.

[21] *Id.* quoting *Amdura Nat'l Dist. Co. v. Amdura Corp.,* 1995 U.S. Dist. LEXIS 21375, *6 (D. Colo. 1995), *aff'd* 105 F.3d 669 (10th Cir. 1997).

[22] *Lister, supra* at 57, citing *Matter of Consolidated Bancshares, Inc.,* 785 F.2d 1249, 1253 (5th Cir. 1986) (services that substantially contribute to a case are those that foster and enhance reorganization.). *See also, In re W.G.S.C. Enterprises,* 47 B.R. 53 (Bankr. N.D. Ga. 1985) (creditor substantially contributed to the reorganization where its objection to confirmation resulted in a modification of the plan from 50% to 100% payout for all unsecured creditors); *In re 9085 East Mineral Office Bldg., Ltd.,* 119 B.R. 246 (Bankr. D. Colo. 1990) (substantial contribution was made where creditor's post-petition efforts were designed to

burden of proving a substantial contribution.[23]

Applying those legal standards to this case, many of VFC's efforts directly benefitted the estate as a whole. At a minimum, its work in investigating and opposing the stalking horse offer for the ranch directly benefitted not only itself but all of the unsecured creditors (and as several of the secured creditors as well). VFC's role in opposing the debtor's first plan, in coordination with other creditors, contributed to the restructuring of the plan's proposed treatment of the unsecured creditors - a plan that was ultimately confirmed. Thus, the second standard is satisfied. But were these efforts undertaken primarily for VFC's own benefit or for the estate as a whole?

When viewed in the context that VFC would only realize a greater dividend if the entire unsecured creditor class benefitted, I conclude that most of its actions were undertaken for itself and the estate as a whole. VFC dedicated significant resources, including Mr. Vianello's time and expertise, Fleeson Gooing's work, and realtor/auctioneer J.P. Weigand's expertise, in not only pursuing its opposition of the sale, but also devising a marketing plan and sales approach to generate a more lucrative way to sell the ranch and in resolving issues concerning the determination of the estate's taxes and the distribution of sale proceeds. If it were acting primarily for its own interests, VFC could have simply opposed debtor's sale proposal; here though, it went a step further and affirmatively presented an alternative and offered viable solutions that were ultimately implemented to deal with the issues presented by debtor's sale motion and plan.

As to VFC's motivation and intent, it knew that its actions would benefit others as well as

---

increase and did in fact increase the payout to the unsecured creditors compared to debtor's proposed plan).

[23] *Lister, supra* at 57; *In re Werth,* 32 B.R. 442, 444 (Bankr. D. Colo. 1983).

-10-

itself. In the absence of an official creditors committee in this case, VFC had to look out for its interests because no one else would. As other courts of appeal have stated, the mere existence of some self-interest should not preclude reimbursement.[24] The presumption that VFC acted in its self-interest is met by the direct beneficial effects that its work conferred on the other creditors. In sum, VFC's efforts opposing the debtor's proposed sale of the ranch and confirmation of debtor's plan, viewed as a whole, substantially contributed to the modification of debtor's plan of reorganization and its confirmation and directly benefitted the unsecured creditor class as well as other creditors.

### *Amount of VFC's Fees and Expenses Allowed as Administrative Expenses*

Not all of the $51,976 fees and expenses sought by VFC, however, substantially contributed to the reorganization; those that did not should not be allowed against the estate.[25] The Court's task here is made more difficult because VFC's application does not specify those fees and expenses billing entries that it is *not* seeking to recover. Attached to VFC's motion were monthly billings for January 3, 2011 through May 30, 2012. But VFC offered billings at trial that covered the entire time period from November 17, 2010, when Fleeson Gooing first entered its appearance in the case, to September 26, 2012, a period of some 23 months. The attorneys' fees from those statements are $53,401 and the expenses are $1,257.70.[26] Adding in the $2,500 appraisal fee incurred by VFC

---

[24] *Lebron v. Mechem Financial Inc.*, 27 F.3d 937, 944 (3rd Cir. 1994). *See also In re Celotex, Inc.*, 227 F.3d 1336, 1339 (11th Cir. 2000)(Creditor's motive in taking actions that benefit the estate has little relevance in determining whether a substantial contribution has been made.).

[25] The Court reminds VFC that a determination that some of its fees and expenses cannot be recovered from the estate under § 503(b) does not mean that the disallowed charges were in any way unreasonable or unwarranted or that Fleeson Gooing is somehow not entitled to collect them from its client pursuant to the terms of its engagement.

[26] These figures compare to VFC's breakdown of its claim – attorney fees of $48,423.17 and expenses of $1,053.02.

(which the Court allows), the total of these amounts is $57,158.70. Because VFC did not show that all of those fees and expenses it claimed substantially contributed to the case, we are left to review the statements to determine to what extent the fees and expenses relate to the activities that constitute substantial contributions. This independent review begins with the initial total of $57,158.70 and supports the following deductions in arriving at the appropriate allowable amount.

VFC's motion enumerates the activities it undertook that benefitted the unsecured class.[27] The first activity listed was serving requests for production of documents upon the debtor in mid-January, 2011. Accordingly, all of the fees and expenses from the first statement dated December 7, 2010 (encompassing charges for the month of November) and all of the charges from the statement dated January 14, 2011 (encompassing the month of December), except the 1.5 hours spent drafting the document requests, are disallowed.[28] The sum of $3,166.57 is disallowed. The Court also observes that Fleeson Gooing's activities early in the case were directed at representing VFC as opposed to the entire unsecured class and included typical client-specific activities like preparing an engagement letter, entering its appearance, reviewing the bankruptcy filing, considering filing a § 523 complaint, and evaluating and researching debtor's possible objections to VFC's claim. These billings should be disallowed. Legal research regarding res judicata and claim splitting that occurred in January also appears to pertain exclusively to VFC's claim. Thus, the February 15, 2011 statement entries dated 1.03.11, 1.06.11, 1.07.11, 1.11.11, 1.13.11, 1.14.11, 1.18.11, and 1.31.11 and Lexis Research

---

[27] Dkt. 380, p. 2.

[28] *See* Debtor's Ex. D and E.

-12-

expense of $4.90, totaling $1,349.90, should be disallowed.[29]

Similarly, activities related to VFC's efforts to purchase other creditors' claims should be disallowed. Most of these efforts were made in February of 2011, before the objection period for the first plan expired. According to the March 16, 2011 statement, all but $602.75 of Fleeson Gooing's fees and expenses were billed for claims and loan purchase activity on behalf of VFC.[30] Mr. Vianello testified that no one responded to his efforts to buy the claims. However, after a number of creditors objected to the confirmation of the first plan, VFC shut down its claim acquisition effort. A plan to purchase all of the claims in a case can only be seen as a self-interested enterprise and not as a "substantial contribution." Fees for that effort – $2,439.07 of the March statement – are disallowed. The claim purchase activity carried over briefly into March and the corresponding fees in the amount of $425 reflected on the April 6, 2011 statement are also disallowed.[31]

After the court heard and denied Barker's sale motion, VFC incurred fees for Fleeson Gooing's preparation and filing of a motion to compel Barker to sell the non-exempt Barker land, or alternatively, for appointment of a trustee in October of 2011.[32] That motion was denied and no

---

[29] Debtor's Ex. F

[30] Debtor's Ex. G. The time entries for 2.24.11 and 2.25.11 describe work on an objection to the disclosure statement and are allowed, as is the deposition expense. The Court notes that a couple of entries on the March 2011 statement arguably pertain to activities that relate to opposing confirmation and the land appraisal, but the time-entries are "batched" with claim purchase activity and the Court has no evidence how to allocate the time among the multiple work described in the single time-entry. Accordingly, the fees for the batched entries will also be disallowed. *See* Entries dated 2.9.11 and 2.28.11.

[31] Debtor's Ex. H. *See* Entries dated 3.8.11, 3.11.11, and 3.14.11.

[32] *See* Dkt. 313.

Case 10-12926    Doc# 432    Filed 12/27/12    Page 13 of 17

trustee was ever appointed.[33] Those unsuccessful efforts did not substantially contribute a benefit to the estate or unsecured creditors as a whole. The fees and expenses attributable to that activity of $2,118 reflected in the November 9, 2011 and December 6, 2011 statements are disallowed.[34]

After the sale of the Barker land, VFC began to assess the possible recovery of their fees and expenses under § 503 and pursuant to that activity Fleeson Gooing billed fees for researching the substantial contribution standard and preparation of the motion now before the Court. Those fees, totaling $1,945, solely benefitted VFC and are disallowed.[35]

Finally, VFC should not receive § 503(b) compensation for work done in July, August and September of 2012 pertaining to Barker's efforts to pay post-petition administrative tax claims. These efforts were directed at opposing Barker's claim of an administrative tax expense for capital gains he or the estate incurred when he cashed an insurance policy. He sought the payment of $112,000 in federal income taxes from the remainder of the sale proceeds.[36] In response, VFC argued

that Barker should pay these taxes from post-confirmation income rather than from estate funds and also asserted that Barker had certain carry-forward tax attributes that were property of the estate. The parties have entered into an agreed order that resolves how all of the remaining sales proceeds are

---

[33] Dkt. 318, 327

[34] Debtor's Ex. O, Entries dated 10.18.11, 10.21.11, 10.25.11, 10.26.11 and Debtor's Ex. P.

[35] Debtor's Ex. U, Entry dated 4.16.12; Debtor's Ex. V, Entries dated 5.1.12, 5.2.12, 5.3.12 and 5.17.12; VFC Ex. A, pp. 47-48 (July 16, 2012 Statement) – all fees except 6.27.12 time entry regarding disbursement order on sale proceeds (.1).

[36] *See* Dkt. 384.

-14-

to be distributed, but the extent of the tax liability remains in controversy.[37] These efforts did not benefit the estate and, in any event, were incurred after the motion for administrative expenses was filed by VFC on June 27, 2012.[38] Thus, the fees and expenses incurred in July, August, and September, as reflected on the billing statements dated August 9, 2012, September 11, 2012, and October 10, 2012, totaling $7,115.06 are disallowed.[39]

To summarize, then, the total amount of VFC's fees and expenses during the period – $57,158.70, should be reduced by the fees and expenses disallowed as an administrative expense as described and set forth above. The chart below summarizes the amount of those reductions for each of the affected billing statements.

| *Date of Statement* [40] | *Amount* |
|---|---|
| December 7, 2010 | 1,609.00 |
| January 14, 2011 | 1,557.57 |
| February 15, 2011 | 1,349.90 |
| March 16, 2011 | 2,439.07 |
| April 6, 2011 | 425.00 |
| November 9, 2011 | 1,668.00 |

---

[37] *See* Dkt. 427.

[38] *See Lister,* 846 F.2d at 57-58 (Creditor's efforts did not result in actual and demonstrable benefit to the estate and creditors where negotiations with potential purchasers of estate assets never came to fruition and creditor's proposed plan was never confirmed).

[39] VFC Ex. A, pp. 49-56. In any event, at trial on the administrative expense motion, VFC conceded that it was not claiming fees and expenses for this time period.

[40] The statement date of Fleeson Gooing's statements covers the preceding month's fees and expenses. For example, the statement dated December 7, 2010 covers the law firm's activity during the month of November 2010.

| | |
|---|---|
| December 6, 2011 | 450.00 |
| May 8, 2012 | 200.00 |
| June 6, 2012 | 460.00 |
| July 16, 2012 | 1,285.00 |
| August 9, 2012 | 2,754.76 |
| September 11, 2012 | 2,661.40 |
| October 10, 2012 | 1,698.90 |
| **Total Disallowed** | **18,558.60** |

Deducting this sum from the total fees and expenses of $57,158.70 yields administrative expenses of $38,600.10 that VFC incurred and substantially contributed to the case.

Fleeson Gooing's billings in the amount of $38,600.10 were reasonable and necessary to VFC's substantial contribution to the case and should be allowed as an administrative expense. The Court has independently reviewed the billing statements to ascertain whether the services and expenses described were reasonable. They were. The time spent on the tasks appears to be very reasonable and no duplication of time and effort is evident. The rates charged for the services are well within the range of customary rates for attorneys and legal assistants in the Wichita market.[41] The balance of the services described comprising the $38,600.10 amount all relate to the sale matters, objecting to the disclosure statement and confirmation of debtor's plan, and procuring disbursement orders regarding the sale proceeds. These activities made a substantial contribution to the bankruptcy case, and were necessary to achieve the result obtained.

VFC's Motion for Administrative Expenses is therefore GRANTED in the amount of

---

[41] The hourly rates for the attorneys ranged from $150-$250 and the hourly rate for legal assistants was $60.

-16-

$38,600.10 and DENIED as to the remainder of the requested attorneys fees and expenses.

# # #